## Gentry v. Piercy, et al.

(Decided April 20, 1917.)

### Appeal from Metcalfe Circuit Court.

1. Easements—Prescription.—An easement to take water from another's spring or well is an incorporeal hereditament, which may be created by grant or prescription.

2. Easements—Prescription—Adverse Character of Use.—An easement to take water from another's spring is created by prescription only by an adverse use of the privilege with the knowledge of the person against whom it is claimed, or by a use so open, notorious, visible and uninterrupted that knowledge will be presumed, and exercised under a claim of right adverse to

the owner, and acquiesced in by him for a period equal at least to that prescribed by the statute for acquiring title to land by adverse possession.

3. Easements—Prescription—Adverse Character of Use.—The creation of a prescriptive easement differs from the acquisition of a title to real estate by adverse possession in this respect: in the former the possession continues in the owner of the servient estate and the prescriptive right arises out of adverse use, while in the latter, the owner is ousted from possession and the right of title arises out of adverse possession, and nothing short of making entry or legal action will break the continuity of possession.

4. Easements—Implied Grant or Reservation.—On the conveyance of one of several parcels of land belonging to the same owner, or upon the partition of land in a judicial proceeding between the heirs of the deceased owner, there is an implied grant or reservation of all apparent and continuous easements or incidents of property which have been created or used by the owner during the unity of possession, though they could then have had no legal existence apart from his general ownership.

5. Easements—Implication.—Where the owner of a large tract of land used a spring located thereon for watering his stock, and the land was divided between his heirs after his death in such a way as to place the spring upon a tract adjoining but separate from the home place which contained the residence, the owner of the home place acquired, by implication, an easement in the use of the spring located upon the adjoining tract.

6. Easements—Prescription.—Where the owner of a large tract of land used a spring located thereon for watering his stock, and the land was divided between his heirs after his death in such a way as to place the spring upon a tract adjoining but separate from the home place which contained the residence, and the owner of the home place continued to use the spring, claiming the right to do so, for a period of more than fifteen years, he acquired an easement to the use of the spring by prescription.

7. Easements—Implication.—Where an easement to the use of a spring upon an adjoining tract arose by implication upon the division of a larger tract which embraced the two smaller adjoining tracts, a verbal agreement between the owners of the adjoining smaller tracts could not affect the right of a subsequent purchaser of the tract to which the easement was appurtenant, to use the spring as it was being used at the time of his purchase.

8. Easements—Damages.—Damages will be allowed against one who unlawfully prevents another from using an easement.

BAIRD & RICHARDSON for appellant.

G. B. STONE and J. W. KINNAIRD for appellees.

OPINION OF THE COURT BY JUDGE MILLER—Reversing.

This is a contest over the appellant's right to use a spring located upon appellees' land.

When James Wade, of Metcalfe county, died in 1864, he owned a farm of 340 acres. He left surviving him a widow and several children, Mrs. Martha Charlton and Mrs. Williams, the wife of Jabez Williams, being two of them.

In a partition suit instituted in 1867, fifty acres adjoining a dower tract of 117 acres, was allotted to Mrs. Charlton. A spring was located upon the Charlton tract, about 30 feet from the division line between that tract and the dower tract, and about 60 yards from the Wade residence. The water seeps through the surface at a point upon the dower tract, forming what is called the "sink hole spring." The stream soon disappears, however, and again appears below in what is called the big spring, upon the Charlton tract. This last named spring is the subject of this controversy.

James Wade had, for many years before his death, lived in a residence located upon what afterwards became the dower tract; and, he had used the big spring as an appurtenance to his residence for a period which extended beyond the memory of any of the witnesses—beginning at least seventy-five years ago.

In 1876, Jabez Williams bought the dower tract and moved upon it; and the sisters, Mrs. Charlton and Mrs. Williams, continued to live upon these adjoining tracts until Mrs. Williams' death in 1898.

In former days the occupants of the James Wade residence had cleaned out the sink hole spring and had taken water therefrom for household purposes by means of a "telegraph" system which carried the water to the house over a wire after the bucket had been raised by a windlass. This use had, however, been discontinued many years ago.

On January 4, 1899, the appellant, George N. Gentry, bought the Williams (dower) tract of 117 acres; moved upon it, and has lived in the James Wade residence continuously ever since. Gentry sold fifty acres of his tract, but still owns 67 acres upon which the residence is located.

When Gentry bought the Williams tract the big spring was enclosed within the barn yard lot; and, he testified that he then thought the spring was upon his land. At any rate, he continued to use it for stock water

continuously and without objection, until September, 1914. About thirty-five years ago, John Charlton, the husband of Martha Charlton, built a division fence which placed the big spring within the Charlton enclosure.

In 1901, Mrs. Charlton conveyed her fifty-acre tract to her niece, the appellee, Daisy Piercy, reserving to herself, however, a life-estate. In 1902, Mrs. Charlton died, and Martha Piercy, as guardian, thereupon took possession of the Charlton fifty-acre tract.

On September 15, 1914, the appellee, Martha C. Piercy, as guardian of her daughter, Daisy Piercy, built a woven wire fence across the passway which led from Gentry's barn lot to the big spring, thereby completely cutting him off from the use of it. At that time Gentry had upon his farm six horses and ten head of cattle, besides his milch cows, that were dependent upon the big spring for water. Some years before Gentry had dug a well near his residence; but it was a weak stream and furnished water barely sufficient for household purposes. As a result of this deprivation, Gentry was compelled to move about one-half of his stock to another tract of land he owned about a mile away. Under this arrangement Gentry was compelled to send a man each morning and evening to the other farm for the purpose of feeding and watering the stock; and, this he continued to do from September 1914 until the next spring, a period of about four months, and until the wire fence was removed pursuant to an order in this case.

On December 31, 1914, Gentry brought this action against Daisy Piercy and her guardian, claiming a right-of-way to the spring and the use of the water thereof, and asking that the defendants be enjoined from interfering with him in the exercise of that right. He also asked for $125.00 damages, for being unlawfully deprived of the use of the spring.

A large amount of proof was taken; and upon a trial the chancellor dismissed the petition. Gentry appeals.

The proof shows, without contradiction, that James Wade and those who held under him had used the big spring located upon the Charlton tract, in connection with his residence located upon the Gentry tract, for a period of at least seventy years before the erection of the wire fence in September, 1914. Gentry had owned the James Wade residence and had used the big spring

in connection therewith for nearly sixteen years before the wire fence was erected, and was so using the house. and spring when Daisy Piercy obtained her title to the Charlton tract, in 1901.

Gentry rests his right to the use of the spring upon the fact that it was an appurtenance attached to the residence of James Wade and necessarily and impliedly went with the Williams tract, when the Wade farm was divided between the heirs in 1867; and also upon the further fact that having used the spring and the passway thereto under a claim of right for more than fifteen years, he has, independent of the first ground relied upon, acquired an easement in the use of the spring and the passway thereto, by prescription.

The appellees meet the first claim of an easement in the spring and the water therefrom as appurtenant to Gentry's land under an implied grant, by showing that many years ago—the exact date is not given, but when Mrs. Williams and Mrs. Charlton were living upon these two adjoining places—Mrs. Charlton threatened to prevent Mrs. Williams from further using the big spring, and that Mrs. Williams bought from her sister the right to use the spring during the life of Mrs. Williams. It is alleged and shown that in payment for this right Mrs. Williams removed an old log cabin that was located upon her place and attached it to Mrs. Charlton's house, as a kitchen. And, as an estoppel to Gentry's claim by prescription through his own use for more than fifteen years, appellees alleged in their answer, and have shown by proof, that Gentry stated on one or more occasions that he was using the water from the big spring with the consent of Peter Piercy, the father of Daisy Piercy.

The alleged trade between Mrs. Charlton and Mrs. Williams was never reduced to writing, and was made long before Gentry bought the Williams tract in 1899; and, he knew nothing of it at the time he bought. Gentry stoutly denied that he ever used the water from the big spring with the consent of anybody, insisting that he used it as a matter of right, and that Peter Piercy had no right to grant the use of the water, to anybody.

In Rollins v. Blackden, 112 Me. 459, Ann. Cas. 1917 A 878, the court, in considering this question at some length, said:

"An easement to take water from another's spring or well is an incorporeal hereditament. It may be created by grant or by prescription. It is created by prescription only by an adverse use of the privilege with the knowledge of the person against whom it is claimed, or by a use so open, notorious, visible and uninterrupted that knowledge will be presumed, and exercised under a claim of right adverse to the owner and acquiesced in by him for a period equal at least to that prescribed by the statute for acquiring title to land by adverse possession. Stillwell v. Foster, 80 Me. 333; Sargent v. Ballard, 9 Pick. (Mass.) 251; Arnold v. Stevens, 24 Pick. (Mass.) 112, 35 Am. Dec. 305; Powell v. Bagg, 8 Gray (Mass.) 441, 69 Am. Dec. 262; Smith v. Miller, 11 Gary (Mass.) 145; Blake v. Everett, 1 Allen (Mass.) 248; School Dist. No. 8 v. Lynch, 33 Conn. 330; Lehigh Valley R. Co. v. McFarlan, 30 N. J. Eq. 180; Workman v. Curran, 89 Pa. St. 226; Nichols v. Aylor, 7 Leigh (Va.) 546; Bealey v. Shaw, 6 East. (Eng.) 216; Livett v. Wilson, 3 Bing. (Eng.) 115; 2 Greenl. on Ev., sec. 539; Washburn on Easements (3rd Ed.), page 160; Jones on Easements, sec. 164; 14 Cyc. 1147. Each of the elements essential to the creation of a prescriptive easement is open to contradiction and liable to be disproved. Smith v. Miller, *supra*. But the existence of all the elements for the requisite time creates a right resting upon a presumption which is conclusive against attack. . . . . In the matter of acquiescence, the creation of a prescriptive easement logically differs from the acquisition of a title to real estate by adverse possession. In the former the possession continues in the owner of the servient estate, and the prescriptive right arises out of adverse use. In the latter, the owner is ousted from possession, and the right or title arises out of adverse possession; and nothing short of making entry or legal action will break the continuity of possession. Powell v. Bagg, *supra;* Workman v. Curran, *supra;* Washburn on Easements, p. 163."

In Manier v. Myers, 4 B. M. 521, this court said:

"In regard to the particular subject of water, Lord Ellenborough said in the case of Bealey v .Shaw, (6 East., 208), 'I take it that twenty years' exclusive enjoyment of water in any particular manner, affords a conclusive presumption of right in the party so enjoying it, derived from grant or act of Parliament.' And although

the expression 'conclusive presumption,' may be too strong, unless understood to mean conclusive until disproved, yet in other respects the position contained in this sentence seems to be entirely consistent with the current of modern English authorities; the period of twenty years having been taken in analogy to the statutory limitation of possessory action for land.

"The right, for the alleged violation of which this action was brought, is an easement or service in the nature of an incorporeal hereditament, and in the case of Million v. Riley, &c. (1 Dana 362) this court recognizes the doctrine that grants of incorporeal hereditaments are presumed, after a possession of twenty years, in analogy to the statute of limitations—and many English cases establish the presumption. There are also various American cases in which it has been decided that the use of water for such a length of time as would, by statute, bar a possessory action for land, will furnish ground for presuming a grant."

And, in Washburn on Easements, p. 81, it is further said:

"It may be considered as settled in the United States that, on the conveyance of one of several parcels of land belonging to the same owner, there is an implied grant or reservation, as the case may be, of all apparent and continuous easements or incidents of property which have been created or used by him during the unity of possession, though they could then have had no legal existence apart from his general ownership."

The extract above taken from Washburn was quoted with approval by this court in Muir v. Cox, 110 Ky. 563, where it was further said:

"No one can believe for a moment that the commissioners who partitioned the land would have assigned the lots to the parties named unless they supposed that the passways then in use would be enjoyed as had been previously done. . . . . If the defendant, James Stone, had conveyed to James B. Stone lot No. 4, Martha E. Stone lot No. 2, and Annie Stone lot No. 3, the grant of the use of the passway would have been implied, although no mention had been made of it in the deed. The use and necessity of the passway would have been apparent. When the deeds of partition were made, although no reference to the passway was made therein, still the grant to the use of the passways was implied.

Of course, no easement would have existed so long as the decedent owned the land, as there was a unity of ownership, and he might have at any time rearranged the several parts of his farm and discontinued the use of the passways; but, when there was a severance by the partition proceeding, the easements were created corresponding to the benefits and burdens mutually existing at the time of the partition."

This rule has uniformly been adhered to by this and other courts of last resort. Koch v. Henry, 80 Ky. 395, 44 Am. Rep. 484; McPherson v. Thompson, 28 Ky. L. R. 266, 89 S. W. 195; Rittenhouse v. Swango, 30 Ky. L. R. 145, 97 S. W. 743; Lebus v. Boston, 107 Ky. 98, 47 L. R. A. 79, 92 Am. St. Rep. 233; Irvine v. McCreary, 108 Ky. 502; O'Daniel v. Baxter, 112 Ky. 336; Ringgold Lodge v. DeKalb Lodge, 157 Ky. 207; Stone v. Birkhead, 160 Ky. 49; Lampman v. Milks, 21 N. Y. 505; Eckerson v. Crippen, 110 N. Y. 585, 1 L. R. A. 487; Blaine v. Ray, 61 Vt. 566.

In Lampman v. Milks, *supra,* the court said:

"This is not a rule for the benefit of purchasers only, but is entirely reciprocal. Hence, if, instead of a benefit conferred, a burden has been imposed, upon the portion sold, the purchaser, provided the marks of this burden are open and visible, takes the property with the servitude upon it. The parties are presumed to contract with reference to the condition of the property at the time of the sale, and neither has a right, by altering arrangements then openly existing, to change materially the relative value of the respective parts."

It follows, therefore, that when the James Wade farm was partitioned, although no reference to the use of the big spring was made, there was an implied grant or reservation to the use of the spring in connection with the James Wade residence which had been created and used by him during his unity of possession; or as said in Muir v. Cox, *supra,* the easements were created corresponding to the benefits and burdens mutually existing at the time of the partition.

And, we do not see how this right which was appurtenant to the use of the dower tract could be affected by the subsequent transaction between Mrs. Charlton and Mrs. Williams. The dower tract at that time belonged to Jabez Williams, and it is claimed that the trade was made with Mrs. Williams. Not only was it a

contract for an interest in land which, in order to carry constructive notice, should have been made by a recorded writing, but Mrs. Williams had no title to the land, and consequently could not make a contract that would affect her husband's land. It being conceded that Gentry had no notice of the contract, the rule that he bought the place with all the visible and apparent easements then existing, applies.

Moreover, the proof clearly shows—indeed, Mrs. Piercy concedes the fact—that Gentry has used the big spring continuously since January, 1899, and was so using it at the time Daisy Piercy took title to the Charlton lot. The burden was upon the appellee to show that Gentry's long continued use of the spring was permissive only. O'Daniel v. O'Daniel, 88 Ky. 189; Larkin v. Ryan, 25 Ky. L. R. 614, 76 S. W. 168; McPherson v. Thompson, *supra;* Rogers v. Flick, 144 Ky. 848.

There is no substantial testimony even tending to show that his right to use the spring was ever questioned before September, 1914, when Mrs. Piercy erected the wire fence to "hold her rights," as she puts it. She admits that the land occupied by the passway has no value for farming purposes, and in no way interferes with her farming operations; that Gentry has no other stock water upon his farm; and that to deprive him of his use of the spring would greatly depreciate the value of his farm.

At most, the testimony that Gentry was using the land by the permission of Peter Piercy who was acting for his daughter, and similar testimony to the effect that Gentry said to a neighbor that if he would buy the Charlton farm, Gentry would give him a strip off the back end of his farm in exchange for the right-of-way to the big spring, does not prove that Gentry did not have an easement in the spring and the right-of-way; it only shows, at most, that he recognized he had only an easement, and desired to acquire the fee.

So, under either view of the case, Gentry's easement in the spring with a right-of-way thereto, is established. He not only acquired it as an easement that existed and was visible and apparent at the time he bought the Williams tract in 1899, but he has established a right thereto by prescription by exercising an asserted right for more than fifteen years.

Upon the question of damages, it appears from the testimony of M. L. Gentry, a son of the appellant, that he fed and watered about one-half of the live stock on the place about a mile from home for a period of four months from about the middle of September; that this required about one-half of his time; and, that by reason of the scarcity of water the stock that remained on the home place depreciated materially in value. The claim for depreciation is necessarily speculative; but, there being no other proof upon the subject, appellant's entire damage is fixed at $50.00.

Judgment reversed with instructions to the chancellor to enter a judgment establishing the appellant's easement as claimed; enjoining the appellee from interfering therewith; and for damages as above indicated.